**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF WISCONSIN**

| | | |
|---|---|---|
| TREVOR SEARLES | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 19-cv-28 |
| | ) | |
| v. | ) | Honorable Judge |
| | ) | |
| BRYDEN MOTORS INC. | ) | Honorable Magistrate Judge |
| | ) | |
| Defendant. | ) | **Jury Trial Demanded** |
| | ) | |
| | ) | |

## <u>COMPLAINT</u>

Plaintiff, Trevor Searles ("Trevor"), for his Complaint against Defendants, Bryden Motors, Inc. ("Bryden Motors" or "the dealership") states as follows:

## NATURE OF ACTION

1.     Trevor brings this action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*., as amended in 1991.  Trevor challenges Bryden Motors' firing of him, in retaliation for reporting his boss's husband for sexual harassing a subordinate.

## JURISDICTION AND VENUE

2.     Jurisdiction is proper under 28 U.S.C. §§ 1331 and 1343.

3.     Venue is proper in the Western District of Wisconsin under 28 U.S.C. § 1391(a)(1) and (2) as Defendant Bryden Motors resides in this district and a substantial part of the events giving rise to the claims occurred here.

## PARTIES

4.     Trevor is a resident of Beloit, Wisconsin who resides in this judicial district.

5.     Bryden Motors is a Wisconsin corporation engaged in the sales of automobiles, trucks and related products and services.  It is located at 548 Broad Street in Beloit, Wisconsin in this judicial district and has employed more than 14 employees for the preceding 20 weeks and continues to do so.

6.     At all times relevant to this claim, Bryden Motors was Trevor's employer as defined by 42 U.S.C. 2000e(b).

## ADMINISTRATIVE HISTORY

7. Trevor was unlawfully terminated by Bryden Motors on March 12, 2018.  Less than two weeks later, he filed his Discrimination Complaint under the Wisconsin Fair Employment Law, Wis. Stat. § 111.31 et seq., with the Equal Rights Division ("ERD") of the Wisconsin Department of Workforce Development, ERD Case No. 201800869. See complaint, attached as Exhibit A.

8. Under the ERD's normal procedures, the charge was cross-filed with the Equal Employment Opportunity Commission as EEOC Case No. 26G2018800654C.

9. On August 28, 2018, the ERD found probable cause to believe that Bryden Motors violated the Wisconsin Fair Employment Law because it discharged Trevor for opposing a discriminatory practice.  See probable cause determination, attached as Exhibit B.

10. To pursue his remedies in federal court, Trevor requested withdrawal of his complaint from the ERD.  Consequently, the ERD action was dismissed Oct. 12, 2018.  See order of dismissal, attached as Exhibit C.

11. At Trevor's request, the EEOC issued Trevor a Notice of Right to Sue on October 25, 2018.  See notice, attached as Exhibit D.

## BACKGROUND

12. Trevor, 32, has lived in the State Line area are for his entire life, working in the automotive and truck sales and service industry.  In his 10-year career following graduation from Turner High School, he had four automotive sales and service jobs. His most recent job before working at Bryden Motors was at J&D Car Care, a truck accessory shop in Janesville.

13. J&D was affiliated with Ziebart International Corporation, a franchisor of businesses offering vehicle appearance and protection services. Trevor worked at J&D for more than six years until August of 2016.

14. At that time, Trevor enjoyed an excellent reputation as a knowledgeable seller and installer of truck and auto accessories, including truck caps and tops, window tinting and spray bed-liners.

15. Trevor was interested in a management position and posted his resume online. Christine Bryden Lawver, the manager of Bryden Motors ("Christine") emailed him shortly after the posting and asked him to interview for the position of manager of the dealership's Ziebart franchise.  Trevor interviewed with Christine and her mother Vicki Bryden, the owner of Bryden Motors ("Vicki").  They offered him the position in the Ziebart shop, a few blocks away from the main dealership.  He accepted the position, starting work on or about August 8, 2016.

16. Trevor's job was to promote the sales of products and services at the shop and to supervise several employees who worked there.

17. When Trevor started his job, the shop operated under the standard Ziebart business model, emphasizing rustproofing and car detailing. The shop did not heavily market many of its services such as window tinting, spray-in bed-liners and installation of aftermarket accessories like brush guards, window vent shades and mirrors.

18. At the beginning of Searle's tenure at Bryden Motors, the shop also was detailing used cars for the dealership; this line of business was barely profitable.

19. Trevor believed the shop could be more profitable by terminating its Ziebart franchise, reducing the detailing work and increasing lines of business that had greater profit margins. Bryden Motors president Scotty Bryden (Christine's brother; "Scotty") agreed that the Ziebart franchise was too costly. In 2017, Trevor established relationships with two very popular brands of truck covers and caps to further that strategy. Installation of some caps and covers could earn a $150 profit after 10 or 15 minutes of work.

20. Trevor discussed his marketing and sales strategy with Christine. She initially was opposed to increasing sales of truck covers and caps. She objected to the dealership paying higher royalties on those sales under the terms of the Ziebart franchise agreement, compared to royalties for detailing services.

21. Christine eventually agreed with Trevor to concentrate on sales of covers and caps, window tinting and bed-liners, and terminated the Ziebart franchise in November 2017.

22. Trevor recommended that the dealership publicize the fact that it was becoming independent, because the shop had been listed online as a Ziebart franchise and would be changing its phone number. Christine ignored that recommendation, leading to customer confusion about how to contact the new shop, now renamed "815 Custom Auto." A decline in sales followed the switch to the new name and phone number.

23. To increase revenue and profit, Trevor began to market the new truck accessory lines when the Ziebart relationship ended. Initial results were promising. Trevor expected profits would spike in the spring of 2018, a season when sales of truck accessories typically improve along with the weather.

24. Trevor also recommended that Bryden Motors do its own used-car detailing rather than paying for that work in the shop Trevor and Bryden Motors general manager George Schaffner ("George") agreed in the summer of 2017 that the dealership would keep the used car detailing "in-house." George reported that agreement to Christine, who concurred.

25. During his 19-month month tenure at the shop, Trevor maintained profits while reducing staff. He created a Facebook page for the shop. He also promoted the shop on the sides of his personal car trailer, which he towed to a go-cart track where his 7-year-old son competed.

26. Trevor also planned to sell wheels and tires, which had been prohibited under the Ziebart franchise agreement.

27.     Trevor was paid an hourly wage and a bonus based on achieving a monthly sales target.  He never once missed that target.  While he never had a formal job performance review, Christine and George gave him only positive feedback.

**RETALIATION FACTS**

28.     Christine's husband Scott Lawver ("Scott") had been manager of the service department, but left the position in about 2016.  He was also the maintenance man at an apartment complex owned by some members of the Bryden family until that property was sold in 2018.

29.     In late 2017, Christine informed Trevor that she was creating an undefined position for Scott in the shop, although Trevor would remain as manager.  Scott had very little experience in sales or installation of car and truck accessories.

30.     Scott began working in the shop in February 2018 and immediately clashed with other employees; he told experienced staff members how to do their jobs and hovered over them while they worked.  He drove away business by misinforming customers about products, pricing and timing.

31.     Several employees complained to Trevor that Scott lacked experience and was oblivious to his lack of knowledge about car and truck accessories.  Within two weeks of Scott starting work, Trevor reported to Christine that Scott did not have the experience to do anything useful in the shop.

32.     At the same time, he was driving away business, Scott was also sexually harassing a 19-year-old female office assistant at the shop ("the victim").

33.     Scott ignored the victim's objections and on at least four occasions when the two were alone, he rubbed her shoulders, neck or back.  On some occasions he stood behind or too close to her.  The harassment occurred during two episodes on or about February 23 and once each day on or about February 26 and 27.

34.     During this period in February 2018, Scott also tried to give the victim his personal cell phone number and offered to pick her up and drive her around if she was out drinking with friends so he could "show them a good time," or similar words to that effect.

35.     Just before Trevor left for a six-day vacation on March 1, he and another shop employee went to Christine's office and told her that Scott should not talk to customers, and she agreed.

36.     When Trevor left on vacation, the victim asked a fellow employee to skip his lunch each day so she would not be alone with Scott.

37.     All three of the employees working with Scott called or texted Trevor on his vacation to complaint about Scott.  The victim reported the harassment to her father, who was the boyfriend of Christine's assistant at the dealership.

38. During Trevor's vacation, apparently after hearing indirectly about Scott's harassment, Christine talked to the victim about Scott. She assured the victim that her husband was not doing anything wrong. When the victim protested that his touching her made her uncomfortable, Christine told her that she was "thinking about it the wrong way" and that "he sees you as a daughter" or words to that effect.

39. Christine told the victim that if Scott continued harassing her that she should not report it to Trevor but should report it directly to Christine.

40. When Trevor first returned to the shop on the afternoon of Wednesday March 7, the victim told him about Scott's sexual harassment.

41. Trevor immediately reviewed video surveillance recordings of the shop to find the alleged harassment. The victim told him the dates and approximate times to search. Trevor took five screenshots of Scott touching or appearing to touch the victim. See Exhibit E.

42. Trevor reported the harassment the next morning on Thursday March 8 to Katie Bontjes, the dealership's director of human resources ("Katie"). He also showed her the screenshots at that time. Katie said she would talk to Vicki.

43. Katie told Trevor she already knew about the victim's harassment claims against Scott. Katie also forwarded the screenshots to Wendy Johnson, the dealership's operations manager ("Wendy").

44. Trevor also reported Scott's harassment to Scotty Bryden, the president of the dealership. Scotty Bryden told Trevor to "just go get another job" or words to that effect.

45. On Friday March 9, Trevor tried to discuss the matter with Christine and Scott, but they avoided him. Christine saw Trevor approaching their car near the dealership, but they left without talking to him. Soon after, Christine texted Trevor that they were late for their bowling league.

46. Witnesses at a fundraiser on Saturday night March 10 overheard Christine telling George that Trevor had fabricated the sexual harassment allegations against Scott and as a result she said: "Guess who I am firing on Monday?" or words to that effect.

47. On Sunday March 11, Trevor was at work for three hours during the middle of the day following up on leads for truck toppers because he was taking a vacation day on Monday March 12, his birthday. Christine was at work at the same time at the dealership and Trevor texted her and suggested that she stop over at the shop.

48. At first, she agreed but then said she had to leave for lunch. Trevor responded by texting her "We need to talk."

49. Early on Monday March 12, Christine arranged to meet the victim at the shop. She asked the victim to handwrite a statement about Scott's touching her. The text of the statement as signed by the victim was:

> Scott has not done anything inappropriate to me. I discussed that I don't enjoy being touched and he understands that because of my past[;] and I am comfortable in my work environment.

50. Also on March 12, Christine met in her office with the two other employees who reported to Trevor. She told them in separate meetings that she was firing Trevor. Among the reasons she gave to those two employees were:

- Trevor was a "hothead"
- He lost the Bryden used car detailing account
- He had a bad attitude about getting along with Scott
- "Bottom line Scott is my husband, he is part of the family, a part owner and he's going to be there" or words to that effect.

51. Trevor tried to meet with Christine on the morning of March 12, but she told him to return at 3 p.m. During the intervening period of time, Christine called the two new suppliers with whom Trevor had established relationships and told them that Trevor was no longer employed at 815 Custom Auto.

52. At the meeting at 3 p.m., Christine and George told Trevor they were "severing ties" with him and asked for his company credit card. They did not tell him the reason was poor performance or give him any reason for his termination other than he and they were not "seeing eye to eye" or words to that effect.

53. Trevor applied for unemployment compensation on or about March 13, 2018.

53. In response to an inquiry from the unemployment compensation investigator, a Bryden Motors representative falsely claimed a supervisor had given Trevor a verbal warning about his performance.

54. In its April 13, 2018 written response to Trevor's complaint in the ERD, Bryden Motors falsely claimed that Trevor was "dismissed due to unsatisfactory performance." See statement, Exhibit F. Wendy faulted him for a decline in sales after the Ziebart franchise was terminated, despite his earlier warning to Christine that the dealership should advertise the new number and the transition to an independent shop.

55. In the same response, Wendy also falsely claimed that he "lost the business account of Bryden Motors due to an indifferent attitude." In other words, the dealership said Trevor lost the account that Christine and George agreed to take back in-house.

56. Further, Wendy falsely stated that Scott was brought in "to assess the situation at hand and to see what changes could be made to regain any lost accounts" even though he was more responsible than anyone for the loss of accounts during his brief stint as a shop employee without a title in February.

57. Finally, Wendy attached a copy of the victim's handwritten statement, which Christine had procured the day she fired Trevor. See Ex. F.

58.     From March until October 2018, Trevor took a job in sales at a Go-Kart track, at a significant salary decrease.

59.     For a brief time in November 2018, when the Go-Kart season ended, Trevor took a job as a car salesman.  He resigned after he determined his income from that job would be negligible.

### COUNT I – RETALIATION IN VIOLATION OF TITLE VII

60.     Trevor realleges paragraphs 1 through 59 and incorporates them by reference into Count I of this Complaint.

61.     Title VII, specifically 42 U.S.C. § 2000e-3, makes it unlawful for an employer to discriminate against an employee who has opposed an unlawful employment practice or has assisted or participated in another employee's claim of discrimination.

62.     Bryden Motors retaliated against Trevor by firing him for reporting Scott's sexual harassment of the victim.  By its conduct, Bryden Motors firing of Trevor was unlawful retaliation in violation of Title VII.

63.     As a direct result of Defendants' unlawful conduct, Plaintiff has suffered extreme emotional distress.

64.     Plaintiff has lost wages, compensation and benefits as a result of Bryden Motors' unlawful conduct.

65.     Plaintiff's career and reputation have been irreparably damaged as a result of Bryden Motors' unlawful conduct.

66.     Trevor suffered embarrassment and humiliation as a result of Bryden Motors' unlawful conduct. Trevor suffered loss of enjoyment of life, inconvenience and other non-pecuniary losses as a direct result of Bryden Motors' unlawful conduct.

67.     Bryden Motors acted with malice, willfulness or reckless indifference to Trevor's rights.  Its conduct was willful and wanton and justifies an award of punitive damages.

### PRAYER FOR RELIEF

**WHEREFORE**, Trevor respectfully requests that this Court find in his favor and against the Bryden Motors as follows:

a.     Declare that the acts and conduct of Bryden Motors violate Title VII, including the anti-retaliation provisions of that law;

b.     Award Trevor the value of all compensation and benefits lost as a result of Bryden Motors' unlawful conduct;

c. Award Trevor the value of all compensation and benefits he will lose in the future as a result of Bryden Motors' unlawful conduct;

d. Award Trevor compensatory damages (back pay, front pay and lost future earnings);

e. Award Trevor punitive damages;

f. Award Trevor prejudgment interest;

g. Award Trevor reasonable attorneys' fees, costs and disbursements; and

h. Award Trevor such other relief as this Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Trevor demands a trial by jury on all questions of fact raised by the Complaint.

Dated: January 11, 2019

> s/ *Kenneth E. Kraus*
> Kenneth E. Kraus
> **KEN KRAUS LAW, LLC**
> 215 Glen Hollow Road
> Madison, Wisconsin 53705
> 312.420.7292
> ken@kenkrauslaw.com